UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ELI DAMON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-30203-KPN |
| | ) | |
| DENNIS HUKOWICZ, individually and as | ) | |
| chief of the Hadley Police Department, | ) | |
| TOWN OF HADLEY POLICE DEPARTMENT, | ) | |
| MITCHELL KUC, and MICHAEL MASON, | ) | |
| | ) | |
| Defendants | ) | |

MEMORANDUM AND ORDER WITH REGARD TO
CROSS-MOTIONS FOR SUMMARY JUDGMENT
(Document Nos. 48 and 57)
August 9, 2013

NEIMAN, U.S.M.J

Eli Damon ("Plaintiff") brought this action asserting certain common law and civil rights claims and seeking a permanent injunction against the Town of Hadley Police Department and certain Hadley police officers ("Defendants"), Dennis Hukowicz (Chief of the Hadley Police Department), Mitchell Kuc (a Hadley police officer), and Michael Mason (a sergeant in the department). Plaintiff sued each officer in both their individual and official capacities. Plaintiff's claims stem from multiple encounters with the Hadley police in connection with his riding a bicycle in the center of the right-hand lane of a state highway, resulting in three traffic stops, the confiscation of both his bicycle and a camera on his helmet, and the pursuit of criminal charges against him.

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties have consented to the jurisdiction of this court. Presently, both Plaintiff and Defendants seek

summary judgment on all of Plaintiff's claims.  For the reasons that follow, the court will

allow Defendants' motion for summary judgment in part and deny it in part and, in turn,

deny Plaintiff's motion for summary judgment.  As a result of these rulings, certain

claims against Mitchell Kuc in his individual capacity will survive: malicious prosecution,

conversion, unreasonable seizure, and violation of the Massachusetts Civil Rights Act.

In addition, one claim against Michael Mason in his individual capacity will survive:

violation of the Massachusetts Civil Rights Act.

The parties have also filed motions to strike certain parts of the opposing side's

statement of facts.  The court will deny Plaintiff's motion to strike and allow Defendants'

motion to strike but in part only.

## II.  STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the

facts in a light most favorable to the non-moving party.  *Benoit v. Tech. Mfg. Corp.*, 331

F.3d 166, 173 (1st Cir. 2003).  Summary judgment is appropriate when "there is no

genuine issue as to any material fact" and "the moving party is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" when the evidence is such

that a reasonable fact-finder could resolve the point in favor of the non-moving party,

and a fact is "material" when it might affect the outcome of the suit under the applicable

law.  *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994).  The non-moving party

bears the burden of placing at least one material fact into dispute after the moving party

shows the absence of any disputed material fact.  *Mendes v. Medtronic, Inc.*, 18 F.3d

13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

"The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006).

## II. BACKGROUND

The court notes as an initial matter that each side has responded to almost every paragraph of the other side's statement of undisputed facts by informally seeking to "strike" certain information as mischaracterizations of deposition testimony, as irrelevant and/or prejudicial, as constituting improper legal arguments or conclusions, and/or as failing to cite the record. The court will not delve into the minutiae of these arguments but will instead refer below only to those that deserve highlighting. The parties have also filed separate, formal motions to strike certain statements and exhibits referenced in the other party's undisputed facts. The court will address below the arguments raised in these separate motions.

### A. Facts Not in Dispute

The parties do not dispute the following facts. At all times relevant to this action, Plaintiff resided in Amherst, Massachusetts. (Concise Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("Defs' SOF") ¶ 1.) He does not own an automobile but, instead, chooses to travel by bicycle. (Id. ¶ 6.) State Highway Route 9 in Hadley is one of the roads on which Plaintiff regularly rode his bicycle. (Id. ¶ 7.) Consistent with his view that bicyclists have the right to use public roads in the same manner as motorists, Plaintiff, since the Summer of 2005, often rode in the center of the travel lane. (Id. ¶ 8, 10; Plaintiff's Response to Defendants' Concise Statement of Undisputed Material Facts ("Pl's SOF") ¶ 10.) He also believes that this practice is often safer than riding closer to the shoulder of the road because motorists

3

approaching from behind will notice him earlier, "perceive [him] as relevant and be able
to react earlier if [he is] in a prominent position."  (Defs' SOF ¶ 14; Exhibit A (attached to
Defs' SOF) at 100.)  Thus, if there was more than one lane in the same direction,
Plaintiff "almost always" rode in the center of one of the lanes, usually in the right lane.[1]
(Exhibit A (attached to Defs' SOF) at 71-72.)

Plaintiff had a number of confrontations with motorists while riding in this manner
on Route 9.  For example, on March 30, 2007, Plaintiff was riding in the middle of the
right lane for approximately one mile when Eric Perkins, driving a pickup truck, "came
up behind [him] and laid on his horn for a pretty long time, and finally went around [him]
and pulled into the Domino's parking lot."  (Defs' SOF ¶ 19-20; Exhibit A (attached to
Defs' SOF) at 108.)  Plaintiff never moved from the middle of the right lane while
Perkins was behind him.  (Defs' SOF ¶ 21.)  Plaintiff, however, followed Perkins into the
parking lot where, he claims, Perkins threw him to the ground on top of his bicycle.[2]
(Exhibit A (attached to Defs' SOF) at 108-109.)  Hadley police officer Adam Bartlett was
dispatched to the scene and later informed Plaintiff that he did not have enough

---

[1] Plaintiff sometimes rode in the left lane if he was "preparing for a left turn, or . . .
passing traffic in the right lane that is moving slower, or if there's an obstruction in the
right lane."  (Exhibit A (attached to Defs' SOF) at 74.)

[2] While Defendants dispute that Perkins was at fault for the physical confrontation
-- citing an Amherst Police Report in which Perkins claimed that Plaintiff initiated the
confrontation in the parking lot -- the court agrees with Plaintiff that the statements
made by Perkins in the police report are inadmissible hearsay and, therefore, should not
be included in the undisputed facts.  *See Nna v. American Standard, Inc.*, 630
F.Supp.2d 115, 125 (D.Mass. 2009) ("It is well established that entries in a police report
which result from the officer's own observations and knowledge may be admitted but
that statements made by third persons under no business duty to report may not."
(quoting *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991))).

information to charge Perkins with a crime.  (Defs' SOF ¶ 23; Exhibit AA (attached to

Defendants' Responses to Plaintiff's Statement of Facts ("Defs' Response") ¶ 3.)

Approximately one month later, Plaintiff made a complaint to the Hadley Police

Department about being harassed by a school bus driver who attempted to pass him on

Route 9 when there was insufficient room on the road.  (Defs' SOF ¶ 25.)  Plaintiff again

met with officer Bartlett who, according to Plaintiff, "kept repeating back [Plaintiff's] story

to [him] incorrectly and then, when [Plaintiff] corrected him, accused [Plaintiff] of being

inconsistent."  (Exhibit F (attached to Defs' SOF) at 264.)  Bartlett claims that he

explained to Plaintiff that "it sounded . . . as though the bus driver was trying to help him

[by yelling at Plaintiff to get out of the road] so that he would not get hurt."  (Exhibit AA

(attached to Defs' Response) ¶ 4.)  Bartlett claims he "said [to Plaintiff] that if someone

told him to get out of the road, they were not threatening him because he did not have

the right to ride in the middle of a lane during rush hour when he was impeding traffic."

(Id.)

Plaintiff was also pulled over by Hadley police on several occasions for riding his

bicycle in this manner on Route 9.  For example, on August 22, 2009, Plaintiff was

riding down the middle of the right lane traveling west at approximately fifteen miles per

hour in a thirty-five mile per hour zone; the traffic was "light to medium," and cars behind

him had to wait until the left lane opened up to pass him.  (Defs' SOF ¶¶ 26, 27; Exhibit

G (attached to Defs' SOF) at 103-104.)  At the time, Hadley police officer Mitchell Kuc

was inside a parked police cruiser in a driveway off the main road.  (Id.)  As Plaintiff

passed, he heard Kuc shout through a loudspeaker to "get out of the middle of the

road."  (Id.)  After hearing this, Plaintiff did not move but instead continued riding in the

center of the right lane.  (Id. ¶ 28.)  Kuc then pulled Plaintiff over and, according to

Plaintiff, told him that it was illegal to ride a bicycle on a state highway and that he was

obstructing traffic.  (Id. ¶ 29; Exhibit A (attached to Defs' SOF) at 126-127.)  According

to Kuc, he stated that Plaintiff was riding on a busy state road, where vehicles travel at a

high rate of speed and where there had been several accidents, and that he was

concerned for Plaintiff's safety.  (Exhibit G (attached to Defs' SOF) at 116.)  Kuc also

stated at the time that if he saw Plaintiff in the middle of the road again, he could be

arrested.  (Exhibit A (attached to Defs' SOF) at 127, 132, 135; Exhibit G (attached to

Defs' SOF) at 117.)  Plaintiff responded by stating that it was not illegal to ride his

bicycle in the middle of the lane and that it was actually safer to do so.  (Defs' SOF ¶ 31;

Exhibit A (attached to Defs' SOF) at 135; Exhibit G (attached to Defs' SOF) at 117.)

Kuc then walked to his cruiser, brought back a statute book, and showed Plaintiff a

statute that Kuc claimed required Plaintiff to move to the right to facilitate overtaking by

other vehicles.  (Defs' SOF ¶ 31.)  Thereafter, Kuc let Plaintiff go without giving him a

written warning.  (Id. ¶ 32.)

Plaintiff had another encounter with Kuc on September 12, 2009.  (Id. ¶ 40.)

Plaintiff was riding in approximately the same vicinity as he had been on August 22,

2009, at approximately the same speed, when he was again pulled over by Kuc.  (Id. ¶

40-41.)  The two had an exchange similar to that which occurred on August 22.  (Id. ¶

41; Exhibit A (attached to Defs' SOF) at 138; Exhibit G (attached to Defs' SOF) at 128-

29.)  Again, Kuc stated that Plaintiff had a duty to move to the right when traffic came up

behind him to allow overtaking traffic to pass, whereas Plaintiff stated that it was safer to

ride down the middle of the lane.  (Defs' SOF 46; Exhibit G (attached to Defs' SOF) at

6

127-28.)  Kuc then confiscated Plaintiff's bicycle and stated that he could pick it up at

the Hadley Police Station.  (Defs' SOF ¶ 42.)  After Kuc took his bicycle, Plaintiff walked

approximately two miles to the police station, where Kuc returned the bicycle.  (Id. ¶ 43.)

At the station, Kuc stated that what Plaintiff had done might have been legal but that he

did not care about the law, as he considered the manner in which Plaintiff was riding his

bicycle on public roads "stupid."  (Id. ¶ 44; Pl's SOF ¶ 44.)  Kuc also stated that, if he

heard that Plaintiff was riding in the middle of the lane on any road in Hadley, he would

make sure Plaintiff was punished.  (Id.)  At his deposition, Kuc testified that he took

Plaintiff's bicycle because he felt its continued operation would be dangerous and that

he was authorized to confiscate it pursuant to his role as a "community caretaker,"

authorizing police officers to take unsafe drivers off the roadway.  (Defs' SOF ¶ 47.)

Kuc pulled Plaintiff over a third time on March 20, 2010.  (Defs' SOF ¶ 51-52.)

Plaintiff was traveling west in the middle of the right lane on Route 9, when Kuc pulled

up behind him, activated his rear blue lights, and began videotaping him from inside his

cruiser.  (Id. ¶ 49-50; Exhibit G (attached to Defs' SOF) at 145; Exhibit I (attached to

Defs' SOF).)  Plaintiff was traveling approximately fifteen miles per hour in a 40 mile per

hour zone, and, again, cars had to wait until the left lane opened up to pass him (and

Kuc).  (Exhibit G (attached to Defs' SOF) at 147; Exhibit I (attached to Defs' SOF).)

After videotaping Plaintiff for twenty-six seconds, Kuc activated his front blue lights and

siren and Plaintiff pulled over.  (Defs' SOF ¶ 51-52.)  Kuc informed Plaintiff that he was

issuing him a citation for failure to keep to the right.  (Id. ¶ 53.)  He explained that, while

Plaintiff generally could ride his bicycle in the middle of the lane, when a vehicle came

up behind him he had to move over to the right.  (Id.)  Kuc then went back to his cruiser

to conduct a background check on Plaintiff.  (Id. ¶ 54.)  Kuc's computer was not

functioning properly; instead, Kuc used Officer David Isakson's computer when he

arrived at the scene.  (Id.)  Because Plaintiff also went by additional names, including

"Eli Damon Cooper," Kuc was further delayed in researching his information.  (Exhibit

BB (attached to Defs' Response).)  Approximately fifteen minutes after Kuc went to his

cruiser, he returned and gave Plaintiff a uniform civil citation for failure to keep right

upon being overtaken.  (Id. ¶ 55.)  Although the citation listed M.G.L. c. 89, § 11B, as

the violated statute, Kuc was mistaken; he intended to list M.G.L. c. 85, § 11B.  (Exhibit

D (attached to Pl's SOF); Defs' Response ¶ 55.)

 After giving Plaintiff the citation, Kuc asked Plaintiff what was on top of his bicycle

helmet.  (Defs' SOF ¶ 56.)  Plaintiff explained that it was a camera.  (Id.)  Kuc then

asked whether the camera was recording his voice, and Plaintiff replied "yes."  (Id.;

Exhibit A (attached to Defs' SOF) at 158; Exhibit G (attached to Defs' SOF) at 168.)

Kuc stated that it was illegal to secretly record his voice; Plaintiff stated that he was not

being secretive but, rather, was openly recording.  (Defs' SOF ¶ 57.)  Kuc explained that

Plaintiff did not inform him of the camera and that it was not apparent because there

was no "flashing red light."  (Id.)  Plaintiff responded that he did not think he needed to

tell Kuc and then took the camera off his helmet and showed Kuc the red light indicating

that it was recording.  (Id.)  Plaintiff states that he was wearing the camera for two

reasons: (1) he "was testing it out for . . . taking footage for educational stuff," and (2) he

"was afraid of being pulled over by the police and [he] wanted evidence in case that

occurred."  (Exhibit A (attached to Defs' SOF) at 160.)  After discussing the camera with

Plaintiff, Kuc stated that he was taking the camera "to hold as evidence" and asked

8

Plaintiff to turn it off.  (Defs' SOF ¶ 60.)  Plaintiff turned off the camera and asked Kuc for a receipt, but Kuc explained that he could not provide one because it was not department policy to do so.  (Id. ¶ 61.)

At some point, Sergeant Michael Mason arrived on the scene, and Kuc discussed with him his intent to bring illegal wiretapping and disorderly conduct charges against Plaintiff.  (Id. ¶ 63, 68.)  Plaintiff testified at his deposition that Mason made disparaging comments about the fact that Plaintiff had obtained an attorney; Mason also stated, according to Plaintiff, that wiretapping was a serious crime, that he was in big trouble, and that if Mason saw him riding in the middle of the lane again he would have Plaintiff arrested immediately.  (Defs' SOF ¶ 63; Pl's SOF ¶ 63.)  Mason, for his part, denies that he made disparaging comments about Plaintiff having an attorney and, instead, claims that he stated "that his having an attorney did not change [Mason's] opinion that [Plaintiff's] manner of operating his bicycle on Route 9 was very dangerous."  (Defs' SOF ¶ 64; Exhibit Y (attached to Defs' SOF).)  Mason also claims that he stated to Plaintiff that "I thought his conduct amounted to disorderly conduct for which he could be arrested."  (Id.)  In any event, Kuc eventually told Plaintiff that he was free to go.  (Defs' SOF ¶ 66.)  He did not inform Plaintiff that he would be bringing any specific charges against him.  (Defs' SOF ¶ 65; Pl's SOF ¶ 65.)  In total, the stop lasted approximately thirty minutes.  (Defs' SOF ¶ 66.)

At some point thereafter, following Mason's suggestion, Kuc spoke with Neil Desroches, an Assistant District Attorney, to obtain his opinion as to whether there was enough support for charges of disorderly conduct and a violation of the wiretapping statute; Kuc explained that he stopped a bicyclist who was riding in the middle of a

travel lane on Route 9, that he observed the bicyclist not moving to the right for overtaking vehicles, and that there was room for the bicyclist to travel on the right side of the road.  (Exhibit K (attached to Defs' SOF).)  Kuc also told Desroches that while he was issuing the citation to the bicyclist he noticed, for the first time, something on the bicyclist's helmet and that, upon inquiry, the bicyclist admitted that it was a video camera which recorded audio.  (Id.)  Desroches stated that he agreed with Kuc that there was sufficient support for the charges.  (Id. ¶ 69-70.)  Later that day, Kuc filed an Application for Criminal Complaint against Plaintiff for unlawful wiretapping and disorderly conduct.  (Defs' SOF ¶ 79.)

The Clerk Magistrate of the Eastern Hampshire District Court found probable cause and issued a criminal complaint charging Plaintiff with unlawful wiretapping in violation of M.G.L. c. 272, § 99(C)(1), and disorderly conduct in violation of M.G.L. c. 272, § 53.  (Id. ¶ 80-81.)  After being arraigned, Plaintiff filed a motion to dismiss, which the court allowed with respect to the wiretapping and disorderly conduct charges but denied with respect to the civil motor vehicle citation Kuc had issued.  (Id. ¶¶ 83, 85; Exhibit Q (attached to Defs' SOF).)  The court held a hearing on the civil citation on October 5, 2010, but because of a mix-up between the court and the Hadley Police Department, Mark Shlosser, who was representing the department on citation appeals that day, was not prepared to proceed.  (Defs' SOF ¶ 87; Exhibit R (attached to Defs' SOF).)  Despite Shlosser's request to continue the hearing, the court dismissed the citation.  (Id.)

Following these dismissals, Plaintiff contacted the District Attorney's Office to obtain his camera.  (Defs' SOF ¶ 98.)  The District Attorney's Office informed him that

the Hadley Police Department had the camera but failed to tell him that it, not the

Hadley Police Department, still had the camera's memory card.  (Id.)  After waiting

"about a month" for the Hadley Police Department to "voluntarily" return the camera,

Plaintiff wrote to Chief Hukowicz asking that the camera be made available to a "family

member or other agent to pick it up."  (Pls' SOF ¶ 99; Exhibit S (attached to Defs'

SOF).)  In response, Hukowicz wrote Plaintiff the following:

> Your property may be picked up at the Hadley Police Department.  You must
> make arrangements with the evidence officer, Sgt. Damion Shanley, who
> works 3pm-11pm to pick it up.  If you are having someone other than yourself
> pick it up, you must supply a written document signed by you authorizing that
> person to pick it up on your behalf.

(Exhibit T (attached to Defs' SOF).)

Plaintiff then asked an acquaintance, Sarah Strong, to go to the Hadley Police

Department on his behalf.  (Defs' SOF ¶ 103.)  He gave Strong a letter addressed to

Shanley authorizing her to receive the camera.  (Id. ¶ 104; Exhibit F (attached to Defs'

SOF) at 227.)  When Strong arrived to retrieve Plaintiff's camera and presented the

letter, Shanely refused to give it to her because the letter was not notarized.  (Pl's SOF

¶ 105.)  According to Shanley, as a matter of practice he always requires a notarized

letter prior to releasing evidence to anyone other than the property owner, and he

informs individuals of this requirement if they contact him in advance.  (Defs' SOF ¶

110; Exhibit U (attached to Defs' SOF) at 62, 71-72.)  Plaintiff had not contacted

Shanley ahead of time.  (Id. ¶ 105.)  Shanley admits, however, that there is no

published policy or procedure stating as much and that the only officer he recalls

advising of this practice was Mason.  (Exhibit U (attached to Defs' SOF) at 62, 71-72.)

On November 29, 2010, Plaintiff's counsel wrote Hukowicz explaining that Plaintiff had complied with the procedures set forth in Hukowicz's letter by sending Strong, along with a signed letter, to retrieve the camera but that Shanley refused to turn it over.  (Exhibit 6 (attached to Pl's SOF).)  Plaintiff's counsel asked that Plaintiff's camera be returned immediately and requested that Hukowicz contact him to make arrangements.  (Id.)  On October 29, 2011, after Plaintiff filed the instant action, Town Administrator David Nixon delivered the camera to Strong, whom he knows personally.  (Defs' SOF ¶ 112; Pl's SOF ¶ 112.)  The memory card, however, was not delivered as it was still in the possession of the District Attorney's Office.  (Defs' SOF ¶ 113.)  On December 14, 2011, two days after a hearing before this court on Plaintiff's motion for the return of his property (Doc. No. 8), Nixon delivered the memory card to Strong.  (Id.)

Plaintiff claims that since the stop on March 20, 2010, unidentified Hadley police officers have ordered him to "get off the road" on at least two occasions while he was riding in the middle of a lane on Route 9.  (Defs' SOF ¶ 92; Pl's SOF ¶ 92.)  On July 27, 2011, Plaintiff was struck by a vehicle while riding his bicycle in the middle of the right eastbound lane on the Coolidge Bridge on Route 9 in Northampton; he suffered personal injuries as a result.  (Defs' SOF ¶ 133.)  In addition to the incidents in Hadley, police officers in other Massachusetts towns have also stopped Plaintiff for riding in the middle of a travel lane, including West Springfield, Easthampton, and Southboro, as well as in one New Hampshire town.  (Defs' SOF ¶ 93-97.)

B.  Defendants' Motion to Strike (Document No. 65)

Defendants have filed a motion to strike (1) references to a report prepared by Plaintiff's expert witness, John Allen, (2) various exhibits submitted by Plaintiff, and (3)

12

the affidavits of two individuals who also claim to have been mistreated by Hadley police officers while bicycling there.  The motion will be allowed in part and denied in part.

    1.  Expert Witness Report

    Defendants first argue that Allen's expert report should be stricken because "an expert report . . . meets the literal definition of hearsay" which cannot be considered on summary judgment.  It is well established, however, that "[n]onmovants may rely on the affidavits of experts in order to defeat a motion for summary judgment [although] such evidence must still meet the standards of Rule 56."  *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993).  In particular, Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  *See Poulis-Minott v. Smith*, 388 F.3d 354, 360 (1st Cir. 2004) (applying this rule to expert evidence).

    To the extent Defendants argue that Allen's report constitutes hearsay because it is unsworn, Plaintiff filed an affidavit by Allen "adopt[ing[] and affirm[ing] and certify[ing] as true under pains and penalties of perjury the entirety of my expert witness report submitted in this case."  (Exhibit 2 (attached to Plaintiff's Opposition to Defendants' Motion to Strike).)  Allen continued: "All facts are of my personal knowledge, except those facts which are referenced to sources therein.  For those facts, [I] relied upon the sources identified, as is set forth in the report."  (Id.)  This affidavit, the court finds, cures any deficiency regarding Allen's compliance with Rule 56(c)(4).  *See Matias v. Amex, Inc.*, 2013 WL 795056, at *2 (D.R.I. March 4, 2013) (collecting cases which hold that

unsworn expert reports subsequently verified by an affidavit may be considered at the summary judgment stage).

Defendants, however, still take issue with certain information contained in Allen's report.  For instance, Defendants seek to strike information regarding the condition of the Norwottuck Rail Trail, an adjoining bike path on a defunct railroad line.  Since Plaintiff himself maintains that Defendants' separate reference to the bike path in their statement of undisputed facts is "immaterial and irrelevant," a description with which the court agrees, it will, as well, not consider the path's allegedly poor condition and/or lack of access.

Defendants also contend that much of Allen's report constitutes improper conclusions of law.  The court agrees.  "Although expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues."  *Hayes*, 8 F.3d at 92.  Many of Allen's statements are improper legal conclusions regarding the state of the traffic laws in Massachusetts, an issue for the court not an expert to decide.  *See Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) ("It is black-letter law that it is not for witnesses to instruct the jury as applicable principles of law, but for the judge.") (quoting *United States v. Newman*, 49 F.3d 1, 7 (1st Cir. 1995)).  In particular, the court will strike paragraphs 114A, 114D, 114E, 114F and 114G from Plaintiff's Response to Defendants' Statement of Undisputed Facts.

As for the remainder of the statements in Allen's report which Defendants target, most discuss generally accepted practices for bicyclists riding in traffic, the requisite

14

width of a lane for motorists to safely pass a bicyclist without changing lanes, and common causes of bicycle accidents.  Allen's report cites a number of sources for these propositions, many of which can be found online.  Defendants argue that Allen's reliance on such internet sources is inappropriate because they are not "self-authenticating."  In response, Plaintiff argues that "such materials are properly before the Court as they are 'published treatises, periodicals, or pamphlets' on a subject that have been relied upon by an expert."  (quoting Fed. R. Evid. 803.18.)  Plaintiff has the better argument; the sources, while available online, are published studies and reports written by reputable experts.  Simply because copies are available on the internet (in addition to print format) does not destroy their reliability under Fed. R. Evid. 803.18.

The court agrees with Defendants, however, that paragraph 114C -- which states that "[n]owhere on Route 9 in Hadley are lanes as much as 14 feet wide, except where they split or merge to accommodate travel in more than one direction" -- should be stricken because Allen admitted at his deposition that he "never did a measurement" of Route 9 and, therefore, the statement was not within his personal knowledge.  (Exhibit 1 (attached to Pl's SOF) at 113.)  Similarly, the court will strike the statement in paragraph 114I indicating that Route 9 is "too narrow to share safely with overtaking motor vehicles."

2. Exhibits

Defendants also seek to strike Plaintiff's Exhibits A-1, A-2, G-1, and G-2. Exhibits A-1 and A-2 are videos of Plaintiff and Allen riding on Route 9 and along the Norwottuck Rail Trail.; the court agrees that these videos fail to show whether Plaintiff

was operating his bicycle in compliance with the relevant traffic rules or the road conditions *at the time of the incidents at issue in this case*.

As for Exhibit G-1, it is a video taken in Orlando, Florida, and found on the website commuterorlando.com showing motorists passing a bicyclist riding in various lane positions.  Exhibit G-2 is a video prepared by the Orlando Police Department regarding the proper lane positioning of bicyclists vis-a-vis motorists under Florida law. The court agrees with Defendants that these videos constitute inadmissible hearsay. Moreover, they are not relevant to the issues in this case as they pertain to bicycling techniques under Florida, not Massachusetts, law.

3.  Affidavits

Finally, Defendants seek to strike the affidavits of Lynn Grabowski and Timothy Cary on the ground that "they are not properly signed."  As Plaintiff explains, however, while the original copies of the affidavits filed with the court were not signed, he has since substituted signed copies.  (See Doc. No. 58-4 and 58-5.)  Nevertheless, the court notes that these affidavits, which describe two encounters with Hadley police officers on Route 9, are of limited value because the affiants are not plaintiffs in this action

C.  Plaintiff's Motion to Strike (Document No. 76)

For his part, Plaintiff seeks to strike the affidavit of Adam Bartlett, another Hadley Police officer but not a party to this lawsuit.  Defendants submitted Bartlett's affidavit in order to dispute Plaintiff's deposition testimony as to what Bartlett said during his encounters with Plaintiff.  Plaintiff claims that the affidavit "is a classic sham affidavit" because it is inconsistent with prior testimony.  The sham affidavit rule" applies when an affidavit "clearly contradicts [that witness's] prior deposition testimony."  *Colantuoni v.*

16

*Alfred Calcagni & Sons, Inc.*, 44 f.3d 1, 5 (1st Cir. 1994).  Here, however, Bartlett was never deposed; therefore, as Defendants argue, his affidavit cannot contradict any "prior testimony."  *See Patterson v. Dolan*, 2001 WL 1154592, at *2 (D.Me. 2001) (where "there is no apparent contradiction" in testimony "*Colantuoni* does not apply").  Persevering, Plaintiff argues that Bartlett's affidavit should be stricken nonetheless because it contradicts Kuc's testimony regarding the state of traffic while Plaintiff was riding on Route 9.  As Defendants explain, however, Bartlett was not present when Kuc observed Plaintiff in traffic; accordingly, the court sees no contradiction at this time in their testimony.

As a last resort, Plaintiff argues that "even if not stricken, the Bartlett affidavit should be afforded no credibility, as it reflects the same bias exhibited by his brother defendant officers."  Plaintiff, however, provides no support for this statement and the affidavit is made on Bartlett's personal knowledge.

## II. DISCUSSION

In his complaint, Plaintiff asserts claims for malicious prosecution and abuse of process (Count I), conversion (Count II), and violations of his civil rights (Count III).  He also seeks a permanent injunction (Count IV), the particulars of which will be described below.

A. Traffic Laws

Much of the parties' dispute comes down to their differing  interpretations of two Massachusetts statutes.  One, Mass Gen. Laws chapter 85, § 11B, provides:

> Every person operating a bicycle upon a way, as defined in section one of chapter ninety, shall have the right to use all public ways in the commonwealth except limited access or express state highways where signs

specifically prohibiting bicycles have been posted, and shall be subject to the traffic laws and regulations of the commonwealth and the special regulations contained in this section, except that: (1) the bicycle operator may keep to the right when passing a motor vehicle which is moving in the travel lane of the way, (2) the bicycle operator shall signal by either hand his intention to stop or turn; provided, however, that signals need not be made continuously and shall not be made when the use of both hands is necessary for the safe operation of the bicycle, and (3) bicycles may be ridden on sidewalks outside business districts when necessary in the interest of safety, unless otherwise directed by local ordinance. A person operating a bicycle on the sidewalk shall yield the right of way to pedestrians and give an audible signal before overtaking and passing any pedestrian.

Operators of bicycles shall be subject to the following regulations:

(1) Bicyclists riding together shall not ride more than 2 abreast but, on a roadway with more than 1 lane in the direction of travel, bicyclists shall ride within a single lane. Nothing in this clause shall relieve a bicyclist of the duty to facilitate overtaking as required by section 2 of chapter 89.

The other statute, Mass Gen. Laws Chapter 89, § 2, provides in relevant part as follows:

If it is not possible to overtake a bicycle or other vehicle at a safe distance in the same lane, the overtaking vehicle shall use all or part of an adjacent lane if it is safe to do so or wait for a safe opportunity to overtake.  Except when overtaking and passing on the right is permitted, the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on visible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle.

Similarly, 720 C.M.R. § 9.06(5) provides that:

[s]ubject to the provisions of M.G.L. c. 89, § 2, the driver of a vehicle when about to be overtaken and passed by another vehicle approaching from the rear shall give way to the right when practicable in favor of the overtaking vehicle, on suitable and visible signal being given by the driver of the overtaking vehicle, and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle.

Significantly, another regulation, 720 C.M.R. § 9.01 explicitly defines "vehicle" as

"including bicycles when the provisions of these rules are applicable to them."  This

definition, combined with the statement in M.G.L. c. 85, § 11B, that "[n]othing in this

clause shall relieve a bicyclist of the duty to facilitate overtaking as required by section 2 of chapter 89," leads the court to conclude that the reference to the "driver of an overtaken vehicle" in M.G.L. c. 89, § 2, includes bicyclists.

Defendants contend that these provisions, read together, require that bicycles ride "as close as practicable" to the right side of the roadway unless there is not faster traffic in the right lane behind the cyclist or unless the cyclist is preparing to make a left turn. In further support, Defendants cite *Five Borough Bicycle Club v. City of New York*, 684 F.Supp.2d 423, 448-49 (S.D.N.Y. 2010), which construed somewhat similar New York statutes. One of those statutes provides that "[e]very person riding a bicycle . . . upon a roadway shall be granted all of the rights and shall be subject to all the duties applicable to the driver of a vehicle by this title, except as to special regulations in this article and except as to those provisions of this title which by their nature can have no application." N.Y. VEH. & TRAF. L. § 1231. The other provides that "any vehicle proceeding at less than the normal speed of traffic . . . shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the road way . . . ." *Id.* § 1120(b). The court in *Five Borough Bicycle Club* held that "[s]ince bicyclists typically proceed at less than the normal speed of traffic and are subject to the same duties as motorists, [the statutes], read together, require that bicycles ride as close as practicable to the right-hand curb or edge of the roadways except where there is no faster traffic in the right-hand lane or when preparing to make a left turn." *Id.* at 449.

Plaintiff, for his part, contends that M.G.L. c. 89, § 2, only addresses a vehicle being overtaken on a two lane road, *i.e.*, one in each direction, and does not apply to

the portions of Route 9 at issue which have multiple lanes of travel in each direction. Because there was a passing lane to the left, Plaintiff asserts, he was free to ride in the center of the right lane continuously in accord with M.G.L. 85, § 11B, which states that bicyclists "shall have the right to use all public ways in the commonwealth" (except those where they are specifically prohibited).  Plaintiff also argues that "taking the lane" in this manner is a universally accepted practice among bicyclists and that it is safer than riding on the right.

In the court's opinion, neither side has the interpretation of these various provisions quite right.  Defendants' assertion that, generally, bicyclists need to ride "as close as practicable" to the right side of the roadway does not appear to take into account safety considerations inherent in the governing statutes unless, of course, they view "practicability" in this manner.  Plaintiff, on the other hand, overstates the equivalence of bicyclists and motorists and, in his own way, ignores safety concerns related to the significant speed differential between bicycles and cars.

For its part, the court, in light of the plain language of the statutory provisions, has little trouble concluding that Massachusetts law requires a slower-traveling bicyclist to pull to the right to allow a faster-traveling motorist to pass *when it is safe to do so under the circumstances.*  While "[b]icycl[ists] are expressly authorized by statute to use most public ways," *Opinion of the Justices to the Senate*, 352 N.E.2d 197, 200 (Mass. 1976) (citing M.G.L. c. 85, § 11B), they are likewise obligated to comply with applicable traffic laws, most notably, M.G.L. c. 89, § 2, which requires bicyclists to "give way to the right in favor of the overtaking vehicle."  This obligation is enhanced by 720 C.M.R. §

9.06(a), which prohibits bicyclists from "unnecessarily" obstructing "the normal movement of traffic."[6]

Concomitantly, motorists may only pass bicyclists "at a safe distance" when passing within "the same lane" or they must wait until a "safe" opportunity to pass by using "all or part of an adjacent lane."  M.G.L. c. 89, § 2.  (The parties agree that an "adjacent lane" includes one going in the same direction or in the opposite direction where appropriate.)  Thus, as required by yet another statute, motorists approaching and seeking to pass a bicyclist also must "slow down and pass at a safe distance and at a reasonable and proper speed."  M.G.L. c. 90, § 14.  Clearly, then, the legislature contemplated that motorists would regularly pass bicyclists.

The statutes also create reciprocal obligations on the part of both motorists and bicyclists to ensure that passing would occur only at a time when it is safe to do so and only in a safe manner.  Such safety, of course, would include the configuration of the roadway and its shoulders, as well as their conditions and/or states of repair.  If need be, these safety considerations must be measured from an objective rather than a subjective viewpoint, because one person's idea of "safety" may differ greatly from another's. *See, e.g.*, Criminal Model Jury Instruction for Use in the District Court,

_____

[6] 720 C.M.R. § 9.06(6)(a) provides in its entirety that "[n]o person shall drive in such a manner as to obstruct unnecessarily the normal movement of traffic upon any highway.  Officers are hereby authorized to require any driver who fails to comply with 720 CMR 9.06(6) to drive to the side of the roadway and wait until such traffic as has been delayed has passed."  Again, the court finds that the word "driver" in 720 C.M.R. § 9.06(a) includes bicyclists.

Instruction 5.240 (MCLE 2013).[7]  In all, in the court's view, "safety" is key to the legislative scheme; it is also the fulcrum upon which much of this case turns.

That said, and contrary to Plaintiff's argument, there is nothing in M.G.L. c. 89, § 2, or any other statutory or regulatory provision which indicates that the obligation of bicyclists to "give way to the right in favor of the overtaking vehicle" does not apply on multi-lane roadways.  Moreover, as discussed, 720 C.M.R. § 9.06(a) prohibits bicyclists from "obstruct[ing] unnecessarily the normal movement of traffic upon any highway." Therefore, Plaintiff's contention that he may "hold" the right-hand lane as long as there is a passing lane to his left, even when there is heavy traffic in both lanes and even when it would be safe for him to pull to the right to allow overtaking traffic to pass,

---

[7] Instruction 5.240, Operating Negligently so as to Endanger, provides in part:

In determining wether the defendant drove negligently in a manner that might have endangered the public, you should take into account all the facts of the situation: the defendant's rate of speed and manner of operation, the defendant's physical condition and how well he (she) could see and could control his (her) vehicle, the condition of the defendant's vehicle, what kind of road it was and who else was on the road, what the time of day, the weather and the condition of the road were, what any other vehicles or pedestrians were doing, and any other facts that you think are relevant.  If you find that the defendant acted negligently, the defendant's intent is not relevant.  You are not required to find that the defendant intended to act negligently or unlawfully.  *This is in that category of situations where public safety requires each driver to determine and to adhere to an objective standard of reasonable behavior.  Therefore the defendant's subjective intent is irrelevant; the issue is whether or not he (she) drove as a reasonable person would have under the circumstances.*

*Id.* (emphasis added).

22

cannot be correct.  It is simply an unreasonable interpretation of the law in terms of its plain language, purpose, and practical implications.[8]

Having construed the applicable traffic laws, the court will now turn to Plaintiff's specific claims.

B.  Malicious Prosecution (Count I)

In Count I of his complaint, Plaintiff asserts a malicious prosecution claim in connection with the criminal charges brought against him for disorderly conduct and under the wiretapping statute.  "To prevail on a claim for malicious prosecution, a plaintiff must establish that he was damaged because the defendant commenced the original action without probable cause and with malice, and that the original action terminated in his favor."  *Chevrin v. Travelers Inc. Co.*, 858 N.E.2d 746, 753 (Mass. 2006).  As might be expected, the parties disagree over each element of this claim.  In the end, however, the court will conclude, as to Plaintiff's claim against Kuc in his individual capacity, that there remain genuine issues of material fact such that summary judgment is not warranted but that summary judgment is appropriate in favor of the other defendants.

As an initial matter, the court agrees with Defendants that there is no evidence that Chief Hukowicz had any involvement with the decision to bring charges against Plaintiff; Plaintiff does not argue to the contrary.  The court also agrees that the Hadley Police Department is immune from this claim; under section 10(c) of the Massachusetts

---

[8] It is important, of course, for both motorists and bicyclists to be aware of all the rules of the road and their respective rights and obligations, as set forth in the statutes and regulations of the Commonwealth.  Unfortunately, anyone traveling the roads of Massachusetts can readily observe that this is not the case.

Tort Claims ACT ("MTCA"), public employers are immune from "any claim arising out of an intentional tort, including . . . malicious prosecution."  M.G.L. c. 258, § 10(c).  As the Hadley Police Department falls within the definition of a "public employer," *see* M.G.L. c. 258, § 1, section 10(c) plainly applies.  Moreover, the official-capacity claims against Kuc and Mason are actually claims against the department itself, *see McMillian v. Monroe County,* 520 U.S. 781, 785 n.2 (1997), and, thus, are barred by the MTCA.  *See Saxonis v. Lynn,* 817 N.E.2d 793, 797 (Mass.App.Ct. 2004).   The court will therefore proceed to address the elements of the malicious prosecution claims against Kuc and Mason in their individual capacities.

   1. <u>Institution of Criminal Proceedings</u>

   The parties first dispute whether Kuc and Mason instituted criminal proceedings against Plaintiff.  For their part, Defendants cite *Morrissey v. Town of Agawam*, 883 F.Supp.2d 300, 312 (D.Mass. 2012), in which this court, after concluding that the defendants there had probable cause to arrest the plaintiff, held in the alternative that the defendants had an insufficient role in the process of charging the plaintiff.  Kuc and Mason, Defendants argue, are similarly situated.  For his part, Plaintiff argues that *Morrissey* is distinguishable and that, by filing the application for a criminal complaint, Kuc actually instituted the criminal proceedings against him.  In addition, Plaintiff asserts that Mason was sufficiently involved with the decision to file the criminal complaint as to render him liable as well.

   There is ample support for the proposition that filing a criminal complaint constitutes the institution of criminal proceedings and, while such conduct is not always *necessary* for a claim of malicious prosecution, it is certainly *sufficient*.  *See Limone v.*

24

*United States*, 579 F.3d 79, 89 (1st Cir. 2009) ("In broad brush, an individual may be said to have instituted criminal proceedings against another if he caused those proceedings to be initiated. . . . The paradigmatic example exists when a person formally swears out a criminal complaint against another person. . . . But malicious prosecution is by no means restricted to this paradigm." (internal citations omitted)); *Goddard v. Kelley*, 629 F.Supp.2d 115, 130 (D.Mass. 2009) ("The act of malicious prosecution begins with the submission, under oath, of a criminal complaint," although "'[a] person need not swear out a criminal complaint in order to be held answerable for malicious prosecution.'") (quoting *Correllas v. Viveiros*, 572 N.E.2d 7, 10 (Mass. 1991)).

In the case at bar, Kuc clearly instituted the criminal proceedings against Plaintiff by filing the application for a criminal complaint. In addition, as Plaintiff argues, *Morrissey* is distinguishable. The court agrees. The plaintiff there "concede[d] that [the defendants] had no formal role in the prosecutorial process and acknowledge[d] that 'there [was] no evidence of affirmative pressure'" by them. *Morrissey*, 883 F.Supp.2d at 312. And in contrast to Kuc here, neither of the defendants in *Morrissey* filed an application for a criminal complaint; rather, the defendant most involved in the prosecution merely completed an arrest report. *Id.*

Mason, on the other hand, did not seek the criminal complaint against Plaintiff. Moreover, there is no evidence that Mason affirmatively induced Kuc to bring any charges. *See Limone*, 579 F.3d at 89-90; *Correllas*, 572 N.E.2d at 318. The record demonstrates that Mason merely encouraged Kuc to contact Desroches, an Assistant District Attorney, because he was unsure whether there was enough support for the charges Kuc wished to bring. Such conduct does not amount to instituting criminal

25

proceedings and, accordingly, the court will enter summary judgment in Mason's favor on the malicious prosecution claim.

2. Probable Cause

As to the next element, Defendants argue that Kuc cannot be liable for malicious prosecution because he had probable cause to pursue the charges. This argument requires the court to analyze both the underlying charges and the factual circumstances of the March 20, 2010 stop. As might be expected, Plaintiff disputes Defendants' assertions.

"In the context of a malicious prosecution action based on a criminal complaint, probable cause has been defined as such a state of facts in the mind of the [defendant] as would lead a [person] of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the plaintiff has committed a crime." *Bednarz v. Bednarz*, 542 N.E.2d 300, 302 (Mass.App.Ct. 1989) (internal quotation marks omitted). Whether probable cause exists "'is judged by an objective, rather than a subjective standard.'" *Chevrin*, 858 N.E.2d at 754 (quoting *Bednarz*, 542 N.E.2d at 303 n.5.). "A lack of probable cause must be affirmatively proved, and may not be inferred from the existence of malice . . . or from the fact of acquittal or anything else. . . . [But] [w]hen the facts are disputed, probable cause is a question for the jury." *Id.* (internal quotation marks and citations omitted).

Here, the underlying charges brought against Plaintiff were violations of M.G.L. c. 272, § 53, *i.e.*, disorderly conduct, and M.G.L. c. 272, § 99(C)(1), commonly known as the "wiretapping statute." An individual is guilty of disorderly conduct if: (1) he creates a hazardous or physically offensive condition by an act that serves no legitimate purpose

26

of the individual; (2) his actions are reasonably likely to affect the public; and (3) he either intended to cause public inconvenience, annoyance or alarm, or recklessly created public inconvenience, annoyance or alarm. *See Commonwealth v. LePore*, 666 N.E.2d 152, 155 (Mass.App.Ct. 1996). The wiretapping statute makes it a crime to "willfully commit[] an interception . . . of any wire or oral communication." M.G.L. c. 272, § 99(C)(1). "The term 'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication . . . ." M.G.L. c. 272, § 99(B)(4).

Regarding the disorderly conduct charge, the court concludes that there are sufficient factual questions as to whether probable cause existed for that charge, namely, that Plaintiff had no legitimate reason for traveling in the middle of the roadway and either intended to cause or recklessly created a public inconvenience, annoyance or alarm. As described, the traffic laws require bicyclists to pull to the right and permit motorists to pass a bicyclist, but only when it is safe to do so. Therefore, if it was not objectively safe under the circumstances preceding the March 20th stop for Plaintiff to pull to the right, then it may be said that he had a legitimate purpose for "holding the road."

As indicated, the court has rejected Plaintiff's argument that, regardless of road conditions and other safety considerations, he has the unfettered right to ride in the middle of the right-hand lane in light of the passing lane to his left. Plaintiff, however, also contends that it was not safe to pull to the right on March 20th because there were

27

not only various driveways in the area -- which could have led cars to unknowingly hit

him upon entering or exiting if he was positioned close to the curb -- but, as well, dirt,

sand and other dangerous debris on the side of the road. To be sure, Plaintiff, in

hindsight, may well be overstating these safety concerns, given his primary position that

he could hold the center of the lane even in the absence of such conditions.  The

record, however, does contain video evidence of Plaintiff riding on Route 9 prior to the

traffic stop, which shows some dirt and sand on the side of the road.  Whether that was

truly the reason for Plaintiff's holding the center of the lane on March 20th is in dispute.

In sum, the issues of safety and, relatedly, probable cause are factual questions most

properly resolved by a jury.[9]

　　　　Factual disputes similarly preclude the conclusion that probable cause existed as

to the wiretapping charge.  As explained by the First Circuit in *Glik v. Cunniffe*, 655 F.3d

78, 87 (1st Cir. 2011) -- which, although decided after the events at issue here, relies on

pre-existing Massachusetts caselaw -- the question of whether an individual "secretly"

records audio of another in violation of the statute "turns on notice, i.e., whether, based

on objective indicators, such as the presence of a recording device in plain view, one

can infer that the subject was aware that she might be recorded."

　　　　Here, Defendants contend that the camera on Plaintiff's helmet was not apparent

and that Kuc did not notice it until after he gave Plaintiff the citation; Plaintiff, on the

other hand, asserts that it was open and obvious.  There is also a dispute as to whether

---

[9] Plaintiff also proffers an expert witness who claims that it is safer, at least under
certain circumstances, for bicyclists to ride in the center of the travel lane in order to
increase their visibility and avoid common collisions.  Whether and/or to what extent that
witness testimony will be entered as evidence will be determined at trial.

the red recording light was visible while the camera was attached to Plaintiff's helmet. Accordingly, if a jury believes Plaintiff's version of the facts, it could conclude that Kuc had actual knowledge of the recording and, as a result, that he did not have probable cause for the wiretapping charge. *See id.* at 88 ("[T]he use in plain view of a device commonly known to record audio is, on its own, sufficient evidence from which to infer the subjects' actual knowledge of the recording.") (citing *Commonwealth v. Hyde*, 750 N.E.2d 963, 971 (Mass. 2001)).

Still, Defendants argue, citing *Cox v. Hainey*, 391 F.3d 25, 32 (1st Cir. 2004), Kuc had probable cause to pursue both the disorderly conduct and wiretapping charges because he consulted with Desroches, the Assistant District Attorney. In *Cox,* the First Circuit held that a pre-arrest consultation with a prosecutor is one factor in determining whether qualified immunity protects an officer from a false arrest claim under 42 U.S.C. § 1983. Unlike the situation in *Cox*, however, the malicious prosecution claim here arises under state, not constitutional, law and, thus, qualified immunity is not applicable. *Williams v. Boston*, 2012 WL 5829124, at *10 (D.Mass. Sept. 21, 2012) (holding that qualified immunity protects police officers from Fourth Amendment malicious prosecution claim but that the plaintiff's state law malicious prosecution claim must survive).

Even so, the First Circuit in *Cox* went out of its way to explain that "a wave of the prosecutor's wand cannot magically transform an unreasonable probable cause determination into a reasonable one" and that, in order to rely on the prosecutor's advice, the officer must have made "a full presentation of the known facts." *Cox*, 391 F.3d at 34, 35. Here, according to Desroches' affidavit, Kuc told him not only that

Plaintiff did not pull to the right for overtaking vehicles even though there was room on the right side of the road, but, in addition, that he only noticed the camera after returning from his cruiser.  As explained, however, Plaintiff asserts that it was not safe to pull to the right and that the camera was plainly apparent.  Therefore, it is also unclear on this record whether Kuc made "a full presentation of the known facts" to Desroches. *Compare id.* at 36 ("The undisputed facts indicate that the two reviewed the available evidence fully and had a frank discussion about it.").  If a jury believes Plaintiff's version of the facts, it could find that Kuc did not have probable cause to pursue the charges.

    3. <u>Malice</u>

Moving on to the next element, Defendants argue that there is no evidence that Kuc acted with malice but, rather, that the evidence indicates that he was trying to keep both Plaintiff and the public safe.  In support, Defendants point out that Kuc only charged Plaintiff after his third stop and even showed him a statute book during the first. Plaintiff, for his part, argues that there is ample evidence to infer malice in the form of both words and conduct, namely, the multiple stops, the refusal to return the camera, and the general hostility toward Plaintiff.  The court concludes that a jury could in fact find malice.

"To raise a genuine issue of material fact on the question of malice, the plaintiff must come forward with some evidence that would permit a fact finder to conclude that [the defendant] (1) knew there was no probable cause, and (2) acted with an improper motive . . . i.e., acted primarily for a purpose other than that of properly adjudicating the claim." *Sklar v. Beth Israel Deaconess Medical Center*, 797 N.E.2d 381, 387 (Mass.App.Ct. 2003) (internal quotation marks and citations omitted).  "'[I]mproper

motive may be one of vexation, harassment, annoyance, or attempting to achieve an

unlawful end or a lawful end through an unlawful means.'" *Chevrin*, 858 N.E.2d at 757

(quoting *Beecy v. Pucciarelli*, 441 N.E.2d 1035, 1038 n.9 (Mass. 1982)).

Looking solely at Kuc's conduct, there is sufficient evidence from which a jury

could infer that he acted with malice in pursuing the charges.  Most telling were Kuc's

statements after the second stop.  First, Kuc acknowledged that Plaintiff may have been

complying with the law by riding in the middle of the lane but stated that he did not care

about the law because he thought Plaintiff's riding technique was "stupid."  He then

stated that if he heard that Plaintiff was riding in the middle of any road in Hadley again,

he would make sure that Plaintiff was punished.  On the basis of these statements, a

jury could infer that Kuc sought the charges, following his next stop of Plaintiff, knowing

there was no probable cause and for the improper purpose of harassing, vexing, or

annoying Plaintiff for what Kuc considered his "stupid" but lawful actions.

4. <u>Termination of Criminal Proceedings in Favor of Plaintiff</u>

As to the last element, Defendants contend that Plaintiff did not prevail with

regard to the criminal charges against him and that at least one of the charges was

dismissed "only because Officer Shlosser did not get notice of the hearing and,

therefore, was unable to proceed."  (Memorandum of Law in Support of Defendant's

Motion for Summary Judgment at 12.)  Plaintiff contends that all of the charges were

terminated in his favor, and the court agrees.

Defendants, in the court's opinion, misinterpret this last prong of the malicious

prosecution claim.  "[A]n accused [need] not endure a full trial and acquittal in order

successfully to allege malicious prosecution."  *Gouin vv. Gouin*, 249 F.Supp.2d 62, 72

(D.Mass. 2003).  Rather, "'[c]riminal proceedings are terminated in favor of the accused by [a] discharge by a magistrate at a preliminary hearing.'"  *Id.* (quoting Restatement (Second) of Torts, § 659).  Plaintiff has satisfied that requirement here; the state trial court allowed his motion to dismiss the two criminal charges, explaining that the Commonwealth could not establish the elements of either charge.  While Defendants are correct that the civil citation was dismissed because Shlosser was not prepared to proceed at the hearing, that proceeding was still terminated in his favor.  *See Chevrin*, 858 N.E.2d at 759 ("[F]avorable termination established by dismissal of proceedings because of failure to prosecute them" (citing Restatement (Second) of Torts, § 674 comment j)).  Moreover, as best the court can determine, the civil citation does not form any basis of Plaintiff's malicious prosecution claim.

In the end, it is inescapable that Plaintiff has brought forth sufficient evidence to defeat Defendants' motion for summary judgment as to the malicious prosecution claim against Kuc in his individual capacity: the court, therefore, will deny Defendants' motion in this respect.  In turn, however, the court will also deny Plaintiff's cross-motion for summary judgment because the issues of probable cause and malice on Kuc's part present factual questions which must be resolved by a jury.  As to the other defendants, the court, for the reasons stated, will enter summary judgment in their favor on the claim.

C.  Abuse of Process (Count I)

Count I of Plaintiff's complaint also includes an abuse of process claim.  "In contrast to a claim for malicious prosecution, a claim under this theory requires proof neither of a termination in the plaintiff's favor, nor want of probable cause."  *Fletcher v.*

32

*Wagner*, 221 F.Supp.2d 153, 155 (D.Mass. 2002).  "The elements of an abuse of process claim are that 'process' was used, for an ulterior or illegitimate purpose, resulting in damage."  *Psy-Ed Corp. v. KleinI*, 947 N.E.2d 520, 534 (Mass. 2011) (internal quotation marks omitted).  "However, the ulterior purpose element is not satisfied merely by showing that a person commenced litigation knowing it was groundless."  *Id.*  Nor is it satisfied by showing that the defendant acted with an improper motive of vexation, harassment, or annoyance.  *Id.* at 534-35.  "Rather, the ulterior purpose must be to gain some collateral advantage," which "has been compared to extortion, in that the defendant has allegedly tried to extract some advantage by wrongful means."  *Id.* at 535 & n.36; *see also Fabre v. Walton*, 781 N.E.2d 780, 783 (Mass. 2002) ("[A]buse of process has been described as a form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money." (internal quotation marks omitted)).

Here again, Defendants argue that the Hadley Police Department is immune from this claim and that Hukowicz and Mason were not involved in instituting the criminal proceedings.  They also argue that there is no evidence that Kuc sought the charges for any ulterior or illegitimate purpose so as to satisfy Plaintiff's claim.  Plaintiff, all but conceding these points, has provided no developed counter-argument.  Moreover, the court finds no evidence that Kuc or anyone else pursued the charges for an ulterior purpose of gaining some collateral advantage.  Accordingly, the court will enter summary judgment in Defendants' favor on this aspect of Count I.

D.  <u>Conversion (Count II)</u>

In Count II of his complaint, Plaintiff asserts conversion claims for the confiscation of his bicycle and, subsequently, his camera.  "The Supreme Judicial Court has . . . endorsed the Restatement (Second) of Torts which defines conversion as 'an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.'  Restatement (Second) of Torts § 222A."  *Gouin*, 249 F.Supp.2d at 76 (citing *Third Nat. Bank of Hampden County*, 446 N.E.2d 380, 383 (Mass. 1983)).  "Conversion is based upon the idea of an assumption by the defendant of a right of property or a right of dominion over the thing converted, which casts upon him all the risks of an owner, and it is therefore not every wrongful intermeddling with, wrongful asportation or wrongful detention of, personal property, that amounts to a conversion."  *Spooner v. Manchester*, 133 Mass. 270, 273 (1882).  "[W]hether an act involving the temporary use, control or detention of property implies an assertion of a right of dominion over it, may well depend upon the circumstances of the case and the intention of the person dealing with the property."  *Id.* at 274; *see also Cahaly v. Benistar Property Exchange Trust Co., Inc.*, 864 N.E.2d 548, 680 n.18 (Mass.App.Ct. 2007) ("Factors to be considered in determining the seriousness of the interference include the extent and duration of the defendant's exercise of control; his intent to assert a right which is in fact inconsistent with the plaintiff's right of control; the defendant's good faith or bad intention; the extent and duration of the resulting interference with the plaintiff's right of control; the harm done to the chattel; and the expense and inconvenience cause to the plaintiff.") (citing Restatement (Second) of Torts § 222A(2) (1965)).

34

Defendants argue that the Hadley Police Department is immune under section 10(c) of the MTCA and that Hukowicz and Mason were not involved in the confiscations. As for Kuc, Defendants argue that he did not take the items for his own use; rather, he took the bicycle because of legitimate safety concerns and the camera as evidence of a crime.  Defendants further argue that Plaintiff's camera was not returned sooner because he failed to follow the correct procedure.  In response, Plaintiff argues that Defendants took his property wrongfully, that the bicycle was not taken for safety reasons, and that the camera was not taken as evidence because no reasonable officer could have believed that he was being secretly recorded.  Plaintiff also argues that the camera was only returned because of this lawsuit and the intervention of the court.

The court agrees with Defendants that Hukowicz and Mason were not involved with the decision to confiscate Plaintiff's property and, therefore, cannot be liable for conversion.  In addition, the Hadley Police Department and Kuc in his official capacity are immune from this claim because "[c]onversion, even though not enumerated in § 10(c) [of the MTCA], is an intentional tort."  *Kelley v. LaForce*, 288 F.3d 1, 13 (1st Cir. 2002).  *See* discussion *supra*.

As to Kuc's individual capacity liability, the court concludes that his confiscation of the bicycle was not a serious enough interference with Plaintiff's right to possess his property as to make out a conversion claim.  The court reaches this conclusion even assuming that the confiscation of Plaintiff's bicycle under the "community caretaking" doctrine may have been wrongful, although the court enters no finding to that effect.  *See* further discussion *infra*.  Simply put, there is no evidence that Kuc took the bicycle asserting his own right to it; moreover, Kuc did not keep the bicycle for an extended

35

period of time but returned it to Plaintiff as soon as he arrived at the station.  It is also undisputed that the bicycle was not damaged in any way.  "A single, temporary, and unimportant use which does not damage the chattel or inconvenience the owner, and is not intended as a defiance of his right, may not be enough for a conversion, whereas an extended use, one which causes damage, or one intended as the assertion of an adverse claim may be sufficient."  Restatement (Second) of Torts § 227, cmt b.

The seizure of the camera on another date, however, is of a different nature. First, the camera was seized and retained prior to Kuc even determining that he would pursue a wiretapping charge.  Second, Plaintiff was not able to retrieve it the same day but, rather, had to wait until the criminal proceedings pursued by Kuc had concluded. Therefore, the interference with his use cannot be characterized as merely "temporary." Third, as discussed, a jury could find that Kuc lacked probable cause for the wiretapping charge, thereby rendering the taking of the camera wrongful *ab initio*.  *See Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993) ("A plaintiff asserting a conversion claim under Massachusetts law must show that: (1) the defendant intentionally and *wrongfully* exercised control or dominion over the personal property . . . . (emphasis added)).  In sum, a jury could find that Kuc is liable for conversion of the camera.

Plaintiff, it must be understood, also takes issue with Defendants' delay in returning the camera following the criminal proceedings, which delay, he argues, amounts to a separate claim for conversion.  A plaintiff may recover on such a conversion claim "if the defendant legitimately acquired possession of the property under a good-faith claim of right, [and] the plaintiff's demand for its return was refused."

*Id.* Therefore, even if a jury finds that Kuc had probable cause for the wiretapping charge -- and thus the seizure of the camera as evidence was not wrongful -- Plaintiff pursues this alternative conversion claim on a separate theory.  In short, Plaintiff contends that Shanley's refusal to release the camera to Strong renders Defendants liable for conversion because they no longer had a lawful reason for holding it.  In response, Defendants argue that Plaintiff never followed the procedure originally laid out by Hukowicz and, therefore, that Shanley was justified in refusing to give the camera to Strong.  On this issue, the court agrees with Defendants.

When Plaintiff contacted Hukowicz about retrieving the camera, he was informed that he would need to contact Shanley to "make arrangements . . . to pick it up." Hukowicz also informed Plaintiff that, if he were to have another person retrieve the camera, he was required to "supply a written document signed by [him] authorizing that person to pick it up on [his] behalf."  Moreover, Shanley did not unconditionally refuse to surrender the camera but, rather, informed Strong of this notarization requirement.  In all, there is no evidence that Plaintiff ever contacted Shanley in compliance with Hukowicz's letter or produced a notarized letter.

Under these circumstances, Shanley's qualified refusal to provide the camera to Strong defeats Plaintiff's conversion claim as a matter of law.  *See* Restatement (Second) of Torts § 238 ("One in the possession of a chattel does not become a converter by making a qualified refusal immediately to surrender the chattel when the circumstances are such that the demand for immediate surrender is unreasonable.").  It is appropriate for police to have adequate procedures to ensure that evidence is properly returned to its rightful owner, especially when someone other than the property

owner comes to collect the evidence.  *See id.*, cmt d ("If a bailee has established

reasonable regulations for the conduct of his business as bailee, a qualified refusal to

surrender a chattel because the demandant has failed to comply with such regulations

does not make the bailee liable under the rule stated in this Section.").  While it is true

that Shanley's notarized letter requirement was not published or well-known, there is no

support for Plaintiff's argument that Shanley made up the requirement on the fly or

instituted it only to punish Plaintiff.

In the end, the court will enter summary judgment in favor of Defendants on

Plaintiff's conversion claims with regard to the confiscation of the bicycle and the delay

in returning the camera but will deny summary judgment as to Kuc in his individual

capacity with regard to the initial seizure of the camera.

E.  Civil Rights Claims (Count III)

In Count III of his complaint, Plaintiff asserts a number of claims styled as civil

rights violations.  In particular, Plaintiff asserts that Defendants violated "the right to

equal protection under the law, the right to be free from unreasonable seizures, the right

to due process of the law, the right of free speech, the right to be free from unlawful

arrest and prosecution without probable cause, and the right to security of the person."

Plaintiff also asserts that Defendants violated the Massachusetts Civil Rights Act

("MCRA"), M.G.L. c. 12 §§ 11H and 11I.

As an initial matter, the court notes that Plaintiff has offered no response to

Defendants' motion for summary judgment on both his equal protection and due

process claims and, as such, has waived them.  *See, e.g.*, *Carmack v. National R.R.

Passenger Corp.*, 486 F.Supp.2d 58, 80 n.6 (D.Mass. 2007).  In addition, the court finds

that Plaintiff's claim for violation of "the right to security of the person" to be duplicative of his unreasonable seizure claim and, therefore, will address only the latter.  *See Bettencourt v. Arruda*, 2012 WL 5398475, at *5 n.2 (D.Mass. Nov. 1, 2012).

1.  Unlawful Arrest and Prosecution

Plaintiff claims that he was unlawfully arrested during the stop on March 20, 2010.  The court disagrees.  As Defendants argue, Kuc lawfully pulled Plaintiff over and the stop did not constitute an arrest.

While a routine traffic stop is a "seizure" under the Fourth Amendment, *Brendlin v. California*, 551 U.S. 249, 255 (2007), it is not normally considered an "arrest" which must be supported by probable cause.  Rather, it "is more analogous to a so-called 'Terry stop,'" *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)), for which "reasonable suspicion" of a traffic violation is the only initial requirement.  *See Kenney v. Floyd*, 700 F.3d 604, 608 (1st Cir. 2012); *see also United States v. Chaney*, 647 F.3d 401, 408 (1st Cir. 2011) ("The contours of the showing necessary to satisfy the Fourth Amendment depend on the nature of the detention: arrests, whether formal or de facto, require that the detaining officer have grounds for probable cause, whereas temporary detentions (including investigatory or *Terry* stops . . .) 'may be grounded on a lesser showing equivalent to reasonable suspicion.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968))).  "Reasonable suspicion is less than probable cause and more than a hunch." *Kenney*, 700 F.3d at 608; *see also Wren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he constitutional reasonableness of traffic stops [does not depend] on the actual motivations of the individual officers involved.").  Certain traffic stops, however, may become *de facto* arrests -- and,

39

therefore, must be supported by probable cause -- depending upon the degree of the

intrusion.  *See United States v. Owens*, 167 F.3d 739, 748-49 (1st Cir. 1999); *United

States v. McCarthy*, 77 F.3d 522, 530 (1st Cir. 1996).

Based on the uncontested facts in the case at bar, the court concludes as a

matter of law that the stop was supported by the requisite reasonable suspicion of a

traffic violation as not to violate the Fourth Amendment.  Moreover, contrary to Plaintiff's

argument, the length of the stop did not make it a *de facto* arrest.  The computer in

Kuc's cruiser was not functioning and he had to wait until Isakson arrived at the scene in

order to conduct the background check; in addition, Kuc had to spend additional time

researching Plaintiff's multiple aliases.  Under these circumstances, a thirty-minute stop

-- during which Kuc and Plaintiff also discussed the applicability of the wiretapping

statute -- was not an unreasonable amount of time.  *See, e.g., Owens*, 167 F.3d at 749

(fifty-minute detention was not a *de facto* arrest because officers had to ascertain

whether driver had a valid driver's license, decide whether to allow the passenger to

drive, and initiate "a number of computer checks on the car and its occupants and

reasonably await[] the results").

To the extent Plaintiff may be said to assert a malicious prosecution claim under

42 U.S.C. § 1983 separate and apart from his common law malicious prosecution claim,

the court concludes that Plaintiff has not demonstrated, or even alleged, a deprivation of

constitutional rights caused by a malicious prosecution.  This is so even though the

court has determined that at least one aspect of Plaintiff's common law claim against

Kuc survives summary judgment.  As the First Circuit explained,

> "[a]ll federal claims for malicious prosecution are borrowed from the common law tort . . . [which] imposes liability on a private person who institutes criminal proceedings against an innocent person without probable cause for an improper purpose.  The federal claim under [42 U.S.C.] section 1983 for malicious prosecution differs from the state civil suit in that it requires that state officials acting 'under color of law' institute criminal proceedings against the plaintiff *and thereby deprive him of rights secured under the Constitution.*"

*Smith v. Massachusetts Dep't of Correction*, 936 F.2d 1390, 1402 (1st Cir. 1991)

(quoting *Torres v. Superintendent of Police*, 893 F.2d 404, 409 (1st Cir. 1990)).

Continuing, the First Circuit stated that

> [m]alicious prosecution does not *per se* abridge rights secured by the Constitution. . . .  In articulating the elements of a malicious prosecution claim under 42 U.S.C. § 1983, we have held that the complaint must assert that the malicious conduct was so egregious that it violated substantive or procedural due process rights under the Fourteenth Amendment. . . .  For procedural due process purposes . . . the plaintiff usually must show the alleged conduct deprived him of liberty by a distortion and corruption of the processes of law, *i.e.*, corruption of witnesses, falsification of evidence, or some other egregious conduct resulting in the denial of a fair trial. . . .  In addition, the plaintiff must show there was no adequate state postdeprivation remedy available to rectify the harm.  If state tort law furnishes an adequate remedy, the plaintiff does not have a Section 1983 cause of action merely because the defendant is a government official.

*Id.* (internal quotation marks and citations omitted).[10]  That said, the First Circuit recently

recognized section 1983 malicious prosecution claims grounded in the Fourth

Amendment for individuals who have been seized pursuant to legal process during the

pretrial period without probable cause.  *See Hernandez-Cuevas v. Taylor*, --- F.3d ----,

2013 WL 3742484, at *6-7 (1st Cir. 2013).

---

[10] The Supreme Court, it must be noted, has since "firmly closed the door on substantive due process as a vehicle for bringing [§ 1983 malicious prosecution] claims."  *Hernandez-Cuevas v. Taylor*, --- F.3d ----, 2013 WL 3742484, at *5 (1st Cir. 2013) (citing *Albright v. Oliver*, 510 U.S. 266 (1994)).

Here, Plaintiff has neither alleged nor demonstrated for present purposes that the prosecution of the state criminal charges deprived him of rights secured by the Constitution.  In fact, Plaintiff does not separately address this claim in his brief; instead, he merely relies on the arguments proffered in support of his common law malicious prosecution claim.

In any event, a section 1983 malicious prosecution claim grounded in a procedural due process violation is not viable because, as demonstrated above, state tort law provides an adequate remedy.  *See, e.g.*, *Robinson v. Carney*, 2010 WL 183760, at *2 (D.Mass. Jan. 20, 2010) ("A resident of Massachusetts aggrieved by a malicious prosecution has resort to a common-law cause of action. . . .  Consequently, a section 1983 constitutional claim of malicious prosecution based on a violation of procedural (or substantive) due process is not viable." (internal citation omitted)).  Furthermore, Plaintiff does not have a viable Fourth Amendment malicious prosecution claim because he "was never arrested or detained on the underlying criminal charges that form the basis of his malicious prosecution claim."  *Britton v. Maloney*, 196 F.3d 24, 29 (1st Cir. 1999) (rejecting Fourth Amendment malicious prosecution claim because plaintiff was not "seized" under Fourth Amendment when he received summons to appear in court but was never detained or arrested).  Accordingly, the court will enter summary judgment in favor of Defendants on Plaintiff's unlawful arrest and prosecution claim.

### 2. Unreasonable Seizure

Plaintiff next claims that Kuc's separate confiscations of his camera and bicycle violated the Fourth Amendment's prohibition against unreasonable seizures.

Defendants argue that the seizure of the camera was lawful because it was evidence of a crime, *i.e.*, a violation of the wiretapping statute.  As for the confiscation of the bicycle during a prior stop, Defendants argue that Kuc properly acted pursuant to his community caretaking function.  Defendants also argue that, even if Kuc's actions were not lawful, he is nonetheless protected by qualified immunity.

"Although . . . ordinarily . . . a seizure of property by a police officer requires a warrant, exceptions exist.  One of these exceptions is for items in plain view."  *United States v. Sanchez*, 612 F.3d 1, 4 (1st Cir. 2010).  Here, Defendants appear to rely, albeit not explicitly, on the plain view exception with regard to the camera.  "A warrantless seizure is lawful under the plain view doctrine as long as (i) the police officer who effects the seizure lawfully reaches the vantage point from which he sees an object in plain view; (ii) probable cause exists to support his seizure of that object; and (iii) he has a right of access to the object itself."  *Id.* at 4-5.  As discussed, while Kuc had a lawful justification (although perhaps not probable cause) for pulling Plaintiff over, *see* discussion *supra*,  it is unclear whether he had probable cause to believe that Plaintiff violated the wiretapping statute.  Therefore, at this stage of the proceedings, Defendants have not satisfied the second element of the plain view defense.

Still, Defendants raise qualified immunity as a further defense to Plaintiff's claim.  Qualified immunity shields government officials performing discretionary functions from liability for civil damages when "their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[T]he qualified immunity inquiry is a two-part test.  A court must decide: (1) whether the facts alleged or shown by the

plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009).

As to the instant matter, it was clearly established at the time of the events at issue that the use of a recording device in plain view renders the recording not "secret" under the wiretapping statute. *See Hyde*, 750 N.E.2d at 971; *see also Glik*, 655 F.3d at 87. Thus, if a jury believes Plaintiff's version of the facts -- that the camera was in plain sight and, accordingly, that Defendant had "actual knowledge" of the recording -- an objectively reasonable officer under the circumstances would have understood that its seizure was unlawful. Given that these facts are still in flux, summary judgment is not appropriate as to Plaintiff's unreasonable seizure claim with respect to the camera.

The lawfulness of Kuc's confiscation of the bicycle depends on yet another exception to the Fourth Amendment's warrant requirement, the "community caretaking exception":

> The community caretaking exception recognizes that the police perform a multitude of community functions apart from investigating crime. In performing this community caretaking role, police are 'expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing and provide an infinite variety of services to preserve and protect public safety.' *Unites States v. Rodriguez-Moralez,* 929 F.2d 780, 784-85 (1st Cir. 1991). Relevant here, the community caretaking function encompasses law enforcement's authority to remove vehicles that impede traffic or threaten public safety and convenience.

*United States v. Coccia*, 446 F.3d 233, 238 (1st Cir. 2006). "When an officer is performing a community caretaking role, the imperatives of the Fourth Amendment are satisfied so long as his actions are reasonable." *MacDonald v. Eastham*, --- F.Supp.3d ----, 2013 WL 2303760, at *6 (D.Mass. May 24, 2013) (citing *Coccia*, 446 F.3d at 239).

This reasonableness inquiry is an objective one. *United States v. Beaudoin*, 362 F.3d 60, 66 n.1 (1st Cir. 2004), *vacated on other grounds sub nom. Champagne v. United States*, 543 U.S. 1102 (2005); *Commonwealth v. Murdough*, 704 N.E.2d 1184, 1187 (Mass. 1999); *cf. Wren*, 517 U.S. at 813. Therefore, even if Kuc was motivated in part by something other than safety concerns, his action was lawful if, from an objective standpoint, it was also a reasonable exercise of his community caretaking function.

As the parties know, qualified immunity is also analyzed against objective standards. *See Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense."). Applying these principles here, the court concludes that, even assuming Kuc's confiscation of Plaintiff's bicycle may not have been a proper exercise of the community caretaking function, he is nonetheless protected by qualified immunity because it was not clearly established that such conduct violated Plaintiff's Fourth Amendment rights. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (courts have discretion to decide whether a right was "clearly established" without first deciding whether the facts establish a constitutional violation). The circumstances leading up to Kuc's seizure of the bicycle follow.

Kuc had already pulled Plaintiff over for riding in the middle of the lane three weeks earlier and on that occasion, August 22, 2009, the two argued about the traffic laws and the safest way to ride a bicycle on Route 9. On September 12, 2009, the stop during which Kuc confiscated Plaintiff's bicycle, he again found Plaintiff riding in the middle of the lane and the two had a similar discussion. Under these circumstances, an

45

objectively reasonable officer could have concluded that, following the traffic stop,

Plaintiff would return to the middle of the road and continue to hold the lane even in

heavy traffic and even if it was safe to pull to the right -- not only because this was the

second time Kuc had observed Plaintiff riding in the middle of the lane but, as well, on

the basis of Plaintiff's own statements.

Not unexpectedly, most cases applying the community caretaking function to the

impoundment of vehicles address situations in which a vehicle was disabled or the

operator was arrested and, thus, the vehicle would otherwise be left on the roadway

unattended.  *See, e.g.*, *Rodriguez-Morales*, 929 F.2d at 785-86; *Commonwealth v.

Motta*, 676 N.E.2d 795, 801 (Mass. 1997).  The doctrine, however, is not limited to that

kind of situation; if anything, courts have defined an officer's authority under the

community caretaking role in quite broad terms.  *See Coccia*, 446 F.3d at 238 ("In

performing this community caretaking role, police are 'expected to . . . prevent potential

hazards from materializing and provide an infinite variety of services to preserve and

protect public safety.'" (quoting *Rodriguez-Morales*, 929 F.2d at 784-85)).  Moreover,

the court has not found any case which establishes that an officer may not impound a

vehicle (or bicycle) under this doctrine when the operator indicates that he or she will

continue to operate in an unsafe manner.  Accordingly, an objectively reasonable officer

could have concluded that the community caretaking doctrine authorized the

confiscation of Plaintiff's bicycle for safety reasons.  *See MacDonald*, --- F.Supp.2d at --,

2013 WL 2303760, at *5 (holding that qualified immunity protects officers from Fourth

Amendment claim because it was not clearly established that the community caretaking

doctrine did not apply to entry into home); *Carter v. Kirk*, 422 Fed. Appx. 752, 754 (10th

Cir.) (unpublished) (holding that qualified immunity protects officers from Fourth Amendment claim of seizure of cattle because "the contours of [the community caretaking] exception as applied to wandering livestock are insufficiently defined to make the alleged illegality of the seizure plain to a reasonable officer").  The court, therefore, will grant summary judgment in favor of Defendants on Plaintiff's claim that Kuc unreasonably seized his bicycle.

3.  <u>First Amendment</u>

Plaintiff also claims that riding his bicycle was "a form of political expression that is protected by the First Amendment" and that, by interfering with this expression, Defendants violated his First Amendment right to free speech.  While, as described below, Plaintiff's claim is creative, the court concludes, as Defendants argue, that Plaintiff was not engaging in expressive speech.

The Supreme Court has rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."  *United States v. O'Brien*, 391 U.S. 367, 376 (1968).  Rather, it "has focused on the context in which the conduct took place, asking 'whether [a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who [perceived] it.'"  *Meaney v. Dever*, 326 F.3d 283, 287 (1st Cir. 2003) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989))).  The simple act of riding a bicycle, without anything more, cannot reasonably be understood to convey Plaintiff's particularized and overwrought message: "a statement of love for the planet, of independence, of caring for the future, of our need to stop our addiction to carbon burning fuels, among other things." (Plaintiff's

47

Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Summary Judgment at 7.)

Even assuming, however, that Plaintiff's bicycle-riding could be considered an act of expressive speech, which the court does not, there is nothing in the record to indicate either that the statute upon which Kuc relied to pull Plaintiff over or his application of the statute to Plaintiff was impermissibly aimed at restricting speech.  Plaintiff might have been expressing his "world view" by riding his bicycle, but that does not exempt him from having to comply with the state's traffic laws.  Accordingly, the court will enter summary judgment in favor of Defendants on Plaintiff's First Amendment claim.[11]

4. MCRA

Plaintiff next claims that Defendants violated M.G.L. c. 12 §§ 11H and 11I, the MCRA, by threatening to arrest him without probable cause if he continued riding in the middle of a lane in Hadley.  "To establish an MCRA claim, [a plaintiff] must prove that his exercise or enjoyment of rights secured by the constitution or laws of either the United States or Massachusetts have been interfered with, or attempted to be interfered with, by threats, intimidation, or coercion."  *Santiago v. Keyes*, 890 F.Supp.2d 149, 153-54 (D.Mass. 2012) (citing M.G.L. c. 12, §§ 11H and 11I).  "A 'threat' means 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.'"  *Goddara*, 629 F.Supp.2d at 128 (quoting *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 631 N.E.2d 985, 990 (Mass. 1994)).  "'Intimidation' means

---

[11] The court notes that Plaintiff has not asserted a First Amendment claim for interference with his right to videotape a police officer in public, *see Glik*, 655 F.3d at 82-85, and, therefore, it does not address this potentially thorny issue.

putting a person in fear for the purpose of compelling or deterring his or her conduct." *Id.* "'Coercion' means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do." *Id.* "Accordingly, the MCRA contemplates a two-part sequence: liability may be found where (1) the defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that he has a constitutional right to do." *Santiago*, 890 F.Supp.2d at 154. "The same qualified immunity standard that applies under section 1983 applies to claims under the MCRA." *Morrissey*, 883 F.Supp.2d at 308.

Defendants argue that the Hadley Police Department and the individual defendants in their official capacities cannot be sued under the MCRA. They also argue that Kuc, Mason and Hukowicz in their individual capacities are not liable because they did not violate any of Plaintiff's statutory or constitutional rights and that, in any event, they are protected by qualified immunity.

Preliminarily, the court agrees with Defendants that the Hadley Police Department and Kuc, Mason and Hukowicz in their official capacities cannot be liable under the MCRA. *See Howcroft v. Peabody*, 747 N.E.2d 729, 744-45 (Mass.App.Ct. 2001) (holding that unlike 42 U.S.C. § 1983, a municipality and individual defendants in their official capacities are not "persons" under the MCRA). In addition, there is no evidence that Hukowicz threatened, intimidated or coerced Plaintiff in any way. Accordingly, the court will grant summary judgment in favor of the Hadley Police Department, Hukowicz and Kuc and Mason in their official capacities with regard to Plaintiff's MCRA claim.

As for the individual capacity liability of Kuc and Mason, the court first concludes that Plaintiff has satisfied the threat, intimidation, or coercion prong of his MCRA claim. Although Defendants are correct that a threat to use lawful means, including a threat to arrest on the basis of probable cause, is not actionable under the MCRA, *see Sena v. Commonwealth*, 629 NE.2d 986, 993-94 (Mass. 1994), it is far from clear that Kuc and Mason were threatening to arrest Plaintiff only on the basis of probable cause.  As discussed, Massachusetts traffic laws only obligate bicyclists to move right when there is overtaking traffic and when it is safe to do so.  Kuc and Mason, however, did not limit their threats to arrest or punish Plaintiff for riding in the middle of a roadway solely to situations in which Plaintiff was obligated to move to the right.  Rather, they made assertedly blanket threats to go after Plaintiff whenever he was riding in the middle of a roadway.  A reasonable person, therefore, could interpret their statements as threats to arrest Plaintiff even when it would be improper to do so.  *See Pheasant Ridge Assocs. Ltd. Partnership v. Burlington*, 506 N.E.2d 1152, 1159 (Mass. 1987) ("If the trier of fact concludes that the selectmen's words could reasonably be understood only to express an intention to use lawful means to block the development, those words would not be a threat, intimidation, or coercion actionable under § 11I."); *Ayasli v. Armstrong*, 780 N.E.2d 926, 934 (Mass.App.Ct. 2002) ("Whether conduct constitutes threats, intimidation, or coercion under the statute is tested by a reasonable person standard.").

In addition to establishing conduct arising to the level of "threats, intimidation, or coercion," however, Plaintiff must demonstrate an interference, or an attempt to interfere, with "rights secured by the constitution or laws of either the United States or Massachusetts."  *Goddard*, 629 F.Supp.2d at 128 ("[F]or example, the statute would

apply where a defendant (1) threatened to beat up the plaintiff if (2) the plaintiff exercised his right to vote.  In the present case, a punch to the throat or a threat of arrest would presumably qualify under the right circumstances as 'threats, intimidation, or coercion.'  The problem is ascertaining the constitutional rights that the assault or the threat were directed to: what did the plaintiff give up that he had a constitutional right to do?").  The right at issue here, according to Plaintiff, is the right to travel.  Indeed, the SJC has recognized a right, under the Massachusetts Declaration of Rights, to intrastate travel, *see Commonwealth v. Weston*, 913 N.E.2d 832, 840-41 (Mass. 2009), and M.G.L. c. 85, § 11B, creates a statutory right for bicyclists to use certain public roads.[12]  Therefore, a jury could find that Kuc and Mason, by threatening to arrest Plaintiff the next time they saw him riding in the middle of the lane no matter the circumstances, interfered or attempted to interfere with his right to ride his bicycle on the roadway.

That leaves the question of Kuc and Mason's possible qualified immunity.  *See Howcroft v. Peabody*, 747 N.E.2d 729, 746 (Mass.App.Ct. 2001) ("The doctrine of

---

[12] The question whether interference with *statutorily* created rights is actionable under the MCRA is somewhat muddled.  Most cases addressing the MCRA speak in terms of constitutional rights.  *See, e.g.*, *Goddard*, 629 F.Supp.2d at 128.  The MCRA's statutory language, however, provides a cause of action for interference with "rights secured by the constitution *or laws of the United States*, or of rights secured by the constitution *or laws of the commonwealth*."  M.G.L. c. 12, §§ 11H and 11I.  Nevertheless, "in order to 'seek redress through [the MCRA as under its federal analog, 42 U.S.C.] § 1983 . . . a plaintiff must assert the violation of a federal [or State] *right*, not merely a violation of federal [or State] *law*.'"  *Perkins v. Commonwealth*, 752 N.E.2d 761, 767 (Mass.App.Ct. 2001) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)).  Here, the court finds, the legislature used the requisite "'rights-creating' language," *Gonzaga University v. Doe*, 536 U.S. 273, 287 (2002), in M.G.L. c. 85, § 11B ("shall have the *right* to use all public ways in the commonwealth (emphasis added))," so as to provide a statutory *right* on the part of bicyclists to use certain public roads.

qualified immunity shields public officials who are performing discretionary functions, not ministerial in nature, from civil liability in § 1983 [and MCRA] actions if at the time of the performance of the discretionary act, the constitutional or statutory right allegedly infringed was not clearly established." (internal quotation marks omitted)).  The court concludes on these facts and for present purposes, however, that an objectively reasonable officer would have known that such threats as were made by Kuc and Mason were unlawful.  *See Nolan v. Krajcik*, 384 F.Supp.2d 447, 465 (D.Mass. 2005) ("[Q]ualified immunity cannot protect the defendants from liability if, on an objective basis, no reasonably competent officer would have acted as they did.").

Accordingly, the court will deny Defendants' motion for summary judgment on this claim as to Kuc and Mason in their individual capacities.

5. *Monell* Claim

In his brief, Plaintiff asserts that the Town of Hadley is liable on a failure to supervise claim pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  As Defendants argue, however, Plaintiff's complaint fails to allege any such claim.  *See, e.g.*, *Elliot v. Strafford County*, 2001 WL 274827, at *3 (D.N.H. Feb. 7, 2001) (rejecting *Monell* claim asserted for the first time at summary judgment stage); *see also In re Citigroup, Inc.*, 2011 WL 1326368, at *2 n.3 (D.Mass. March 31, 2011) (collecting cases for proposition that "[t]he Court may reject new claims that are not part of a complaint and are instead added for the first time in an opposition to summary judgment or a memorandum in support of a motion for summary judgment").  Nor has Plaintiff moved to amend his complaint to include a failure to supervise claim.  Simply put, this claim is untimely.

52

F.  Permanent Injunction (Count IV)

In addition to the claims discussed above, Plaintiff broadly seeks "a permanent injunction enjoining the defendants from preventing the plaintiff or any other bicyclist from using the roads and public ways of the Commonwealth the same as any other citizen and enjoining the defendants from interfering with the free use of the roads and public ways of the Commonwealth in the same manner as any other citizen who may use a motor vehicle rather than a bicycle."  Aside from the fact that this request is overbroad and unfocused -- and, as such, the court would not be inclined to grant such an injunction in any event -- Plaintiff has not met the basic standards for a permanent injunction at this time.

"Before a permanent injunction may issue, the district court must find that (1) plaintiff prevailed on the merits of its claim; (2) plaintiff would suffer irreparable harm absent injunctive relief; (3) the harm to plaintiff would outweigh any harm to defendant; and (4) the injunction does not adversely affect the public interest."  *Metro-Goldwyn Mayer, Inc. v. 007 Safety Products, Inc.*, 183 F.3d 10, 14 n.2 (1st Cir. 1999).  At this time, Plaintiff stumbles at the first hurdle.  Plaintiff has yet to prevail on the merits of any of his underlying claims; he has merely survived Defendants' motion for summary judgment in several respects.  *See, e.g.*, *Magriz-Marrero v. Union de Tronquistas de Puerto Rico, Local 901*, --- F.Supp.2d ----, 2013 WL 1223338, *2 (D.P.R. March 27, 2013) ("As a preliminary matter, the Court has already determined that entry of a permanent injunction was inappropriate where plaintiffs had not prevailed on the merits of their underlying claims through a jury trial or successful motion for summary judgment.").  The request, therefore, is premature.

IV.  C<small>ONCLUSION</small>

For the foregoing reasons, Defendants' motion for summary judgment is ALLOWED as to that portion of Count I asserting an abuse of process claim, that portion of Count II asserting a conversion claim for confiscation of the bicycle, and those portions of Count III asserting an equal protection claim, a due process claim, a claim for unlawful arrest and prosecution, an unreasonable seizure claim for the confiscation of the bicycle, and a First Amendment claim.  The court, however, DENIES Defendants' motion for summary judgment as to that portion of Count I asserting a malicious prosecution claim against Kuc in his individual capacity, that portion of Count II asserting a conversion claim for seizure of the camera against Kuc in his individual capacity, and those portions of Count III asserting an unreasonable seizure claim for seizure of the camera against Kuc in his individual capacity and an MCRA claim against Kuc and Mason in their individual capacities.  The court also DENIES Plaintiff's motion for summary judgment  The Clerk shall schedule a pretrial conference and trial.

SO ORDERED.

DATED: August 9, 2013

   /s/ Kenneth P. Neiman  
KENNETH P. NEIMAN  
U. S. Magistrate Judge